UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUDY MARTINEZ, JR., <br><br> Plaintiff, <br><br> v. <br><br> CAROLYN W. COLVIN, <br> Acting Commissioner of Social Security, <br><br> Defendant. | Case No.: 1:15-cv-0797-JLT <br><br> ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT CAROLYN COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF RUDY MARTINEZ, JR. |

Rudy Martinez, Jr. asserts he is entitled to disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record, and seeks judicial review of the decision to deny benefits. Because the ALJ applied the proper legal standards, the decision is **AFFIRMED**.

**PROCEDURAL HISTORY**

In the applications for benefits, Plaintiff alleged disability beginning August 25, 2011. (Doc. 10-3 at 11.) The Social Security Administration denied Plaintiff's applications at the initial level and upon reconsideration. (*Id.*) After requesting a hearing, Plaintiff testified before an ALJ. (*Id.* at 26.) The ALJ concluded Plaintiff was not disabled and issued an order denying benefits on September 5, 2013. (*Id.* at 24.) Plaintiff's request for review by the Appeals Council was denied on March 20, 2015. (*Id.* at 2.) Thus, the ALJ's determination became the final decision of the Commissioner of Social Security. ///

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

The Commissioner established a sequential five-step process for evaluating a claimant's

alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.   Relevant Medical Evidence**

On August 24, 2011, Plaintiff was taken to the emergency department of Kaiser Foundation Hospital after suffering a seizure. (Doc. 10-8 at 13.) Paramedics found Plaintiff in a postictal state, and Plaintiff was confused about the date, time, and year upon his arrival at the hospital. (*Id.*) His "mental status [was] back to normal" approximately thirty minutes later, though he did not recall having the seizure. (*Id.* at 13-14.) Dr. Trilok Puniani conducted a neurological consultation, during which Plaintiff reported he had three cans of beer and smoked marijuana prior to the episode. (*Id.* at 28.) He denied having any prior seizures or head trauma. (*Id.*) Dr. Puniani opined Plaintiff's seizure disorder had an "unclear etiology," but indicated that an "alcohol withdrawal seizure [could] not be excluded." (*Id.* at 29.) Plaintiff's "imagining [were] essentially unremarkable" and his "labs [were] all normal" the next morning. (Doc. 10-9 at 23.) He was discharged from the hospital on August 25. (*Id.*)

Plaintiff returned to the hospital for a follow-up visit on August 29, 2011. (Doc. 10-9 at 29.) Plaintiff reported he was "feeling much better" after beginning Keppra, which was an anti-seizure medication. (*Id.*) His neurological exam was "grossly normal," and Plaintiff was referred to a neurologist. (*Id.* at 30.)

On September 13, 2011, Plaintiff had a neurological evaluation. (Doc. 10-9 at 38-39.) Plaintiff reported he was "[d]oing well," and denied having "any further episodes of seizures," "headaches, vertigo, or confusional states." (*Id.* at 39.) Dr. Puniani noted Plaintiff was "oriented to person, place, month and year" but not the date. (*Id.*) Dr. Puniani determined Plaintiff had "normal" muscle tone and strength, and "no atrophy, cogwheeling or rigity." (*Id.*) According to Dr. Puniani, Plaintiff's "generalized convulsive disorder" was "well under control." (*Id.*)

Dr. Nawar reviewed the medical record and completed a physical residual functional capacity assessment on January 13, 2012. (Doc. 10-4 at 5-7.) Dr. Nawar noted Plaintiff was diagnosed with a seizure disorder but found the record showed the seizures were "controlled with meds." (*Id.* at 5.) Dr. Nawar opined Plaintiff should "[a]void unprotected heights;" could occasionally climb ramps and stairs; and could never climb ladders, ropes or scaffolds." (*Id.* at 6.) In addition, Dr. Nawar indicated Plaintiff needed to "[a]void even moderate exposure" to dangerous machinery. (*Id.* at 7.)

Dr. Puniani completed a "Driver Medical Questionnaire" for the Department of Motor Vehicles on June 13, 2012. (Doc. 10-7 at 72- 76.) Dr. Puniani noted Plaintiff complained of daytime drowsiness with his medication and a "lack of concentration," but was unclear whether the medication was the cause of the drowsiness. (*Id.* at 73, 76.) According to Dr. Puniani, Plaintiff "had an isolated seizure," and his MRI and spinal tap were "normal." (*Id.* at 76.)

On June 20, 2012, Dr. Limos, M.D., reviewed Plaintiff's records for and completed a physical residual functional capacity assessment. (Doc. 10-4 at 31-33.) Like to Dr. Nawar, Dr. Limos opined that Plaintiff could occasionally climb ramps and stairs; never climb ropes, ladders, or scaffolds; and needed to "[a]void even moderate exposure" to hazards such as heights and dangerous machinery. (*Id.* at 32-33.)

On November 13, 2012, Plaintiff suffered a second seizure, which Dr. Puniani attributed to "poor compliance with his Meds." (Doc. 10-10 at 8.) Dr. Puniani noted Plaintiff had "self lowered the dosage of Keppra" that he was taking each day. (*Id.*)

In May 2013, Plaintiff had a "neurology reevaluation" with Dr. Puniani. (Doc. 10-10 at 7-10.) Dr. Puniani noted Plaintiff complained of "memory problem[s] and getting more forgetful," as well as being "under stress and . . . depressed." (*Id.*) Dr. Puniani found Plaintiff's seizure disorder was "fairly well under control." (*Id.*) He diagnosed Plaintiff with "[m]ild cognitive impairment, multifactorial, due to a lack of concentration secondary to sedative effects of medications, and multiple stressors." (*Id.* at 8.) Dr. Punaiani encouraged Plaintiff to do "activities to improve memory with reinforcement" such as cross word puzzles and keeping a diary, and referred him to "Behavior Medicine." (*Id.* at 8-9.)

In June 2013, Plaintiff visited Dr. Puniani, requesting that Dr. Puniani complete "[m]edical condition verification forms from Child Support." (Doc. 10-10 at 3.) He again told Dr. Puniani that

he was "doing well" and denied having "any more seizures." (*Id.* at 5.) In addition, Plaintiff reported he was seen "in Behavior Medicine" and would "be undergoing counseling." (*Id.*)

### B.     Administrative Hearing Testimony

Plaintiff testified at a hearing before the ALJ on August 12, 2013. (Doc. 10-3 at 26.) He said he had a twelfth-grade education, and served in the Army from 1980 to 1992. (*Id.* at 31.) Plaintiff said he last was employed in 2008 and worked as a "warehouser." (*Id.*) He explained the job required him "to load, unload, operate forklifts, [and] stock." (*Id.* at 32.) In addition, Plaintiff was a supervisor, which required him to keep track of the inventory. (*Id.* at 32-33.) Plaintiff reported that after being in the military, his work was "always some kind of shipping/receiving/warehousing/stocking." (*Id.* at 33.) In each job, Plaintiff was required to lift and carry "[a]bout 50/60 pounds." (*Id.* at 34.)

He believed he was no longer able to work due to his "concentration under the medication" for his seizures. (Doc. 10-3 at 34-35.) Plaintiff reported he also "always had problems with [his] … short-term memory." (*Id.* at 34.) In addition, Plaintiff testified he had "high blood pressure, severe sleep apnea," and was "starting to see a psychiatrist for depression." (*Id.* at 35.) He reported he had recently received a prescription for Prozac to address his depression. (*Id.* at 38.)

Plaintiff reported that his driver's license "was taken away from [him] after the first seizure." (Doc. 10-3 at 30.) Plaintiff said his license expired, and he did not pursue getting it back because he was "scared to drive, and [his] family won't allow it." (*Id.*) He explained he was "constantly drowsy, so it's not safe" for him to drive. (*Id.*)

He testified that he had "severe sleep apnea," for which the doctors "wanted to give [him] a CPAP machine." (Doc. 10-3 at 43.) Plaintiff said he "told them that it was plugging up [his] nose," after which "they suggested a drastic procedure." (*Id.*) Plaintiff said they suggested detaching his jaw and tongue, moving his tongue forward, and "cutting off the little thing in the back." (*Id.*) In the alternative, Plaintiff said they could "give… one of those holes in [his] throat." (*Id.*) Plaintiff thought the suggestions were "totally ridiculous" because "all [he] told her was … that it plugged [his] nose," so he did not return. (*Id.* at 43-44.) However, Plaintiff said that after he learned there were "newer" CPAP machines that use "a different breathing apparatus," he made an appointment for the Wednesday immediately after the hearing "to get the new one." (*Id.* at 44.)

He estimated that he spent about two hours each morning and two hours each afternoon lying down and resting. (Doc. 10-3 at 39.) He reported that he did "a little light gardening in the morning," such as raking leaves, for about twenty minutes. (*Id.* at 40.) Plaintiff said he spent the rest of the day sitting outside or in a recliner, but when he watched television he would "usually end up drowsing off then, too." (*Id.* at 39-40.) He reported that he did not cook, but did his own laundry and cleaned his room. (*Id.* at 41.) Plaintiff said he did not do other activities around the house, attend social groups, attend church, or visit with friends on a regular basis. (*Id.*) He explained he could "get very, very depressed to where [he didn't] even want to do anything," and he had suicidal thoughts about twice a month. (*Id.* at 49, 51.)

Plaintiff believed he was able to sit for "about 30 minutes" at one time before he needed "to get up," and stand for about "[t]he same amount" of time. (Doc. 10-3 at 45.) He explained that he tried walking two blocks to the store and "got tired." (*Id.* at 46.) Plaintiff said he was "not weak," and could "still probably lift about 25 pounds, but not on a –repetition-wise." (*Id.*) Plaintiff testified he could concentrate "without forgetting things, probably about 20 minutes." (*Id.*) He explained he needed "to write things down all the times," such as passwords, appointments, and telephone numbers. (*Id.* at 46-47.)

Vocational expert Judith Najarian (the "VE") testified after Plaintiff at the hearing, and classified Plaintiff's past work—using the *Dictionary of Occupational Titles*[1]—as a material handler, DOT 929.687-030, and warehouse supervisor, DOT 929.137-022. (Doc. 10-3 at 52-53.) She explained that "as performed" by Plaintiff, both jobs were within the "heavy" exertion level. (*Id.* at 53.) The VE opined Plaintiff obtained skills that "would transfer to a specific job as a forklift operator," which was "medium" work. (*Id.* at 54-55.)

The ALJ asked the VE to consider "an individual of the same age, education, and past work experience" as Plaintiff, "possessing the residual functional capacity to perform light work, except never climb ladders, ropes or scaffolds." (Doc. 10-3 at 55.) The individual was required to "[a]void

---

[1] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

concentrated exposure to extreme heat, excessive vibration, and unprotected heights," as well as "concentrated use of moving machinery." (*Id.*) Further, the hypothetical person was "limited to simple, routine, repetitive tasks." (*Id.*) The VE opined that such a person could not perform Plaintiff's past relevant work, either as he performed it or as generally performed in the economy. (*Id.*) However, the VE determined there were other jobs in the national economy that could be done, such as ticket taker, DOT 344.667-010; mail clerk or sorter, DOT 209.687-026; and price marker DOT 209.587.034. (*Id.* at 56-57.)

Next, the ALJ asked the VE to "add the additional limitation[:] cannot sustain sufficient concentration, persistence or pace for an eight-hour work schedule." (Doc. 10-3 at 57.) The VE opined a person with this limitation could not perform Plaintiff's past work or other jobs in the economy. (*Id.*)

## C.     The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of August 25, 2011. (Doc. 10-3 at 13.) At step two, the ALJ found Plaintiff's severe impairments included: "sleep apnea, hyperlipidemia, hypertension, major motor seizures, and obesity." (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.* at 13-14.) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never climb ladders, ropes or scaffolds; he must avoid concentrated exposure to extreme heat, excessive vibration and unprotected heights; he must avoid concentrated use of moving machinery; and he is limited to performing simple, routine and repetitive tasks.

(*Id.* at 15.) Based upon this RFC, the ALJ determined Plaintiff was "unable to perform any past relevant work." (*Id.* at 17.) However, the ALJ found there were "other occupations with jobs existing in significant numbers in the national economy" that Plaintiff could perform, including ticket taker, mail clerk, and price marker. (*Id.* at 18.) Consequently, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 18-19.)

## DISCUSSION AND ANALYSIS

Appealing the decision of the ALJ, Plaintiff asserts the ALJ failed to identify clear and convincing reasons for finding Plaintiff's testimony regarding his subjective complaints lacked

credibility. (Doc. 18 at 7-9.) In addition, Plaintiff contends the ALJ did not properly analyze his residual functional capacity given his "moderate difficulties" with concentration. (*Id.* at 10-11.) On the other hand, Defendant argues the ALJ properly evaluated Plaintiff's credibility, and the ALJ's decision should be affirmed by the Court. (Doc. 19 at 5-9.)

**A.  Plaintiff's Credibility**

In assessing credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Where the objective medical evidence shows an underlying impairment, and there is no affirmative evidence of a claimant's malingering, an "adverse credibility finding must be based on clear and convincing reasons." *Id.* at 1036; *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).

The ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 10-3 at 16.) However, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." (*Id.*) Consequently, the ALJ was required to set forth clear and convincing reasons for rejecting Plaintiff's testimony regarding his limitations.

Factors that may be considered by an ALJ in assessing a claimant's credibility include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct, (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment, and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) (the ALJ may consider a claimant's reputation for truthfulness, inconsistencies between a claimant's testimony and conduct, and a claimant's daily activities when weighing the claimant's credibility). The ALJ considered a number of factors including the effectiveness of treatment, Plaintiff's noncompliance with treatment, and conflicts with the medical record. (*See* Doc. 10-3 at 15.)

1. Effectiveness of treatment

When assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. §§ 404.1529(c), 416.929(c). Importantly, when an impairment "can be controlled effectively with medication," it cannot be considered disabling. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

In this case, the ALJ noted that Dr. Puniani determined Plaintiff's "seizure disorder was well under control." (Doc. 10-3 at 16, citing Exh.1, pg. 90 [Doc. 10-9 at 39]) In addition, the ALJ observed that "[t]reatment records indicate [the] seizure disorder is fairly well controlled with Keppra twice daily." (*Id.*, citing Exh. 4F, pg. 7 [Doc. 10-10 at 8]) After Plaintiff was compliant with the treatment, he "had no more seizures." (*Id.*) Because the seizure impairment was treated successfully and reduced the severity of Plaintiff's symptoms, the effectiveness of the treatment supports the ALJ's adverse credibility determination.

2. Failure to comply with treatment

The Regulations caution claimants that "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work." 20 C.F.R. §§ 404.1530(a), 416.930(a). If a claimant fails to follow the prescribed treatment without an acceptable reason, the Commissioner "will not find [the claimant] disabled." 20 C.F.R. §§ 404.1530(b), 416.930(b). Accordingly, the Ninth Circuit determined, "[A]n unexplained, or inadequately explained, failure to . . . follow a prescribed course of treatment . . . can cast doubt on the sincerity of the claimant's pain testimony." *Fair*, 885 F.2d at 603. Therefore, noncompliance with a prescribed course of treatment is clear and convincing reason for finding a claimant's subjective complaints lack credibility. *Id.; see also Bunnell*, 947 F.2d at 346.

The ALJ observed that Plaintiff "admitted he had been noncompliant with medication prior to []his second seizure." (Doc. 10-3 at 16, citing Doc. 10-10 at 8.) As noted by Dr. Puniani in the treatment notes cited by the ALJ, Plaintiff "self lowered the dosage of Keppra" that he was taking each day. (Doc. 10-10 at 8.) Thus, Dr. Puniani attributed the second seizure to "poor compliance with his Meds." (*Id.*) In addition, the ALJ noted that Plaintiff "refused to use a CPAP machine prescribed by his physician." (Doc. 10-3 at 16.) Because Plaintiff failed to comply with his prescribed treatments for

both his seizure disorder and sleep apnea—as the ALJ observed—this factor supports the adverse credibility determination.

### 3. Objective medical record

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained that while "testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("lack of medical evidence cannot form the sole basis" for an adverse credibility determination, but remains "a factor that the ALJ can consider in his credibility analysis"). Because the ALJ did not base the decision solely on the fact that the record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to simply state that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must identify "what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ must identify "what evidence suggests the complaints are not credible").

In this case, the ALJ observed that Plaintiff's "hyperlipidemia and hypertension have not resulted in any end organ damage," and "[d]iagnostic studies found no heart abnormalities." (Doc. 10-3 at 16) Further, the ALJ noted Plaintiff's "[p]hysical examinations were unremarkable." (*Id.*, citing Exh. 1F, pp. 7, 14-15, 21-22, 25, 30 [Doc. 10-8 at 8, 15-16, 22-23, 26, 31]) Because the ALJ carried the burden to identify specific evidence in the record undermining Plaintiff's assertions that his hyperlipidemia and hypertension are disabling impairments, the objective medical record supports the adverse credibility determination. *See Greger*, 464 F.3d at 972; *Johnson v. Shalala*, 60 F.3d 1428,

1434 (9th Cir. 1995) (an ALJ may consider "contradictions between claimant's testimony and the relevant medical evidence").

####   4.   Conclusion

For the reasons set forth above, the ALJ properly set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958. Accordingly, Plaintiff fails to show the ALJ erred in rejecting the credibility of his subjective complaints.

### B.   "Moderate Difficulties" with Concentration

At step three of the sequential evaluation, the ALJ observed that Plaintiff had "difficulty maintaining longer periods of attention and concentration." (Doc. 10-3 at 13.) Therefore, the ALJ concluded that Plaintiff had "moderate difficulties" with "concentration, persistence or pace." (*Id.*) Plaintiff contends the ALJ did not adequately address this limitation with the residual functional capacity. (Doc. 18 at 10.)

Specifically, Plaintiff alleges "the RFC determination did not account for the ALJ's own finding that, as a result of prescribed anti-seizure medications, [Plaintiff] has 'moderate difficulties' with his concentration, persistence and pace and in his ability to complete daily activities." (Doc. 18 at 10.) According to Plaintiff, "The ALJ did not adequately address the nonexertional limitations posed by his inability to concentrate and complete activities on "a regular and continuing basis." (*Id.* citing SSR 96-8p; *Carmickle*, 533 F.3d at 1164.)

As an initial matter, the mental limitations identified at step three are not an RFC assessment, and are rather used to determine whether a claimant satisfies a Listing. *See* SSR 96-8P, 1996 WL 374184, at *4 (July 2, 1996).[2] Nevertheless, the Ninth Circuit determined the limitation to unskilled work adequately encompasses a claimant's "moderate mental residual functional capacity limitations" and "marked limitation in [an] ability to maintain concentration over extended periods. *See, e.g.,*

---

[2] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, the Ninth Circuit gives the Rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989); *see also Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) ("SSRs reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations").

*Thomas v. Barnhart*, 278 F.3d 947, 953, 955 (9th Cir. 2002). Similarly, the Court concluded the limitation to "simple, routine, repetitive" accommodated the examining and reviewing physicians' findings that the claimant had a "slow pace" and "several moderate limitations in other mental areas." *Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008); *see also Sabin v. Astrue*, 337 Fed. App'x. 617, 620-21 (9th Cir. 2009) (finding the ALJ properly assessed medical evidence when finding that—despite moderate difficulties as to concentration, persistence, or pace—the claimant could perform simple and repetitive tasks on a consistent basis).

Because the ALJ limited Plaintiff to "simple, routine and repetitive tasks," the RFC adequately addressed Plaintiff's "moderate difficulties" with concentration. *See, e.g., Thomas*, 278 F.3d at 953-55; *Stubbs-Danielson*, 539 F.3d 1169; *Sabin*, 337 Fed. App'x at 620-21. Accordingly, the ALJ did not err in assessing Plaintiff's difficulties with concentration.

## CONCLUSION AND ORDER

As discussed above, the ALJ applied the proper legal standards in evaluating Plaintiff's credibility and addressing his limitations with concentration. Therefore, the conclusion that Plaintiff is not disabled must be upheld by the Court. *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security, and against Plaintiff Rudy Martinez, Jr.

IT IS SO ORDERED.

Dated:   **September 1, 2016**             **/s/ Jennifer L. Thurston**
                                           UNITED STATES MAGISTRATE JUDGE